1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

11  LONNIE L. JOHNSON,                    )    1:08-CV-01220 LJO SMS HC
                                          )
12              Petitioner,               )
                                          )    FINDINGS AND RECOMMENDATION
13      v.                                )    REGARDING PETITION FOR WRIT OF
                                          )    HABEAS CORPUS
14                                        )
    J. WALKER,                            )
15                                        )
                Respondent.               )
16  _____)

17
18          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus
    pursuant to 28 U.S.C. § 2254.
19
                                    **BACKGROUND**
20
21          Petitioner is currently in the custody of the California Department of Corrections pursuant to
    a judgment of the Superior Court of California, County of Kern, following his conviction by jury
22
    trial on December 12, 2005, of first degree murder. (LD[1] 1.) The jury also found true the special
23
    allegations that the murder was committed during the commission of a robbery and that Petitioner
24
    personally used a deadly or dangerous weapon during the commission of the murder. (LD 1.)
25
    Petitioner was sentenced to serve a term of life without the possibility of parole. (LD 1.)
26
27          Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District

28          _____
            [1]"LD" refers to documents and pleadings lodged by Respondent with his answer.

1    (hereinafter "Fifth DCA"). On May 14, 2007, the Fifth DCA affirmed the judgment. (LD 1.)

2    Petitioner then filed a petition for review in the California Supreme Court. (LD 2.) The California

3    Supreme Court summarily denied the petition on July 25, 2007. (LD 3.)

4            Petitioner also sought collateral relief in the state courts. On October 11, 2007, he filed a

5    habeas petition in the Kern County Superior Court. (LD 4.) The petition was denied in a reasoned

6    opinion on December 10, 2007. (LD 5.) On February 1, 2008, he filed a habeas petition in the Fifth

7    DCA. (LD 6.) The petition was summarily denied on February 29, 2008. (LD 7.) On March 24,

8    2008, he filed a habeas petition in the California Supreme Court. (LD 8.) It was summarily denied on

9    October 1, 2008. (LD 9.)

10           On August 19, 2008, Petitioner filed the instant federal habeas petition in this Court. He

11   presents the following three claims for relief: 1) He claims his Sixth and Fourteenth Amendment

12   rights were violated when the prosecution excluded a prospective African-American juror; 2) He

13   claims the trial court improperly refused to admit witness testimony regarding third-party culpability;

14   and 3) He alleges the trial court committed reversible error by instructing the jury on the robbery

15   special circumstance allegation. On December 2, 2008, Respondent filed an answer to the petition.

16   On December 22, 2008, Petitioner filed a traverse.

17                                **FACTUAL BACKGROUND**[2]

18           This case arises out of the stabbing and asphyxiation death of Yolanda Espinoza (the
     victim). On June 15, 2003, Bakersfield Police Officer Todd Dickson was on assignment,
19   patrolling downtown Bakersfield, when he was dispatched to an apartment complex on 17th
     Street around 9:00 p.m. Officer Dickson was accompanied by one other officer. They went to
20   the victim's apartment and knocked on the door. After getting no response, they went around
     to the back of the apartment and looked in the window. The window, which was about four
21   feet from the ground, was open a few inches. Officer Dickson could see the victim lying on
     the floor in the living room. The officers returned to the front door, which was unlocked, and
22   entered the apartment. The officers secured the apartment, and then turned over the
     investigation to detectives.

23
             A crime lab technician took photographs and a video-recording of the crime scene
24   and tested for fingerprints. A plastic bag found over the victim's head included no usable
     prints. A plastic bag, containing two videotapes, and a red cloth purse were found on the bed
25   in the victim's bedroom at the back of the apartment. A latent print on the plastic bag with the
     videotapes matched [Petitioner]'s right index finger. One of the videotapes ("The Wizard of
26   Oz") also included a print that matched [Petitioner]'s right middle finger. A wooden-handled

27   _____

28        [2]The facts are derived from the factual summary set forth by the Fifth DCA in its opinion of May 14, 2007, and are
     presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). (LD 1.)

knife, which tested positive for blood, was found on the kitchen counter. No usable prints were found on the knife. Other items were found on the bed in the back bedroom, including several pieces of paper, "Mickey Mouse" earrings in a plastic bag, and "Lip Smacker" lip balm in a plastic bag. The parties stipulated that a pair of shoeprints beneath the back window did not belong to [Petitioner].

The victim's autopsy showed that the cause of death was asphyxia due to suffocation by a plastic bag. The victim also had numerous stab wounds on the front part of her body, including 45 to 50 stab wounds in the right side of the chest above the breast. She also had stab wounds on her neck, abdomen, left wrist, and right thigh. The victim had defensive wounds on her hands and wrists, the pattern of which was consistent with raising her hand up in front of her face to try to avoid being stabbed. There were also bruises on her neck consistent with someone grabbing her neck, and then scratching it as the person pulled away.

The victim's daughter, Yolanda Espinoza, and her boyfriend visited the victim and spent the night at the victim's apartment on the Thursday before she was killed. Espinoza confirmed that the victim had a little portable "boombox" stereo in the apartment, which she kept in her bedroom. When Espinoza went through the apartment with police officers, she pointed out that the boombox was missing.

According to Espinoza, the victim was shy and mostly kept to herself. The victim also had epilepsy and was mentally slow. Espinoza knew her mother to not let strangers into her house. The victim received assistance from a public agency, and had been living at the apartment for about a year before she was killed.

Stephen Anthony [FN1] acknowledged that he had contact with [Petitioner] in June 2003, and testified that he bought a boombox from [Petitioner] in exchange for a $20 piece of crack cocaine. Just before Anthony bought the boombox from [Petitioner], Anthony was at the house of someone named "Alvin" which was located around 28th Street. [Petitioner] arrived at the house with a "youngster." [Petitioner] was the one carrying the boombox. Anthony's stereo in his car had gone out, so he talked to [Petitioner] about buying the boombox. During the exchange, Anthony did not talk to the youngster.

FN1. Anthony was in custody at the time of his testimony for not complying with the subpoena he had received from the district attorney's office.

The fact that Anthony bought a boombox from [Petitioner] came to the attention of police when Anthony was arrested for driving a stolen car. Anthony claimed that he "rented" the car from [Petitioner] in exchange for rock cocaine. During an interview with Detective Mark Charmley on June 23, 2003, Anthony revealed that, prior to renting the car from [Petitioner], he had also bought a boombox from [Petitioner]. Anthony told the detective that the boombox was in his own car which had been impounded (the reason he needed to rent a car from [Petitioner]). Detective Charmley got Anthony's car released from the impound lot for Anthony, and retrieved the boombox, which was identified as the one missing from the victim's apartment.

Anthony had three prior convictions: one for possession of narcotics in 1982, one for felony possession of stolen property in 1993, and one for nonresidential burglary in 1997. Anthony testified that nobody ever promised him anything for coming in and testifying.

Detective Mark Charmley, and his partner, Detective Dennis McBride, were assigned to investigate the homicide. Detective Charmley interviewed 13-year-old T.C., who implicated himself in the incident. Detective Charmley also interviewed [Petitioner] following [Petitioner]'s arrest on June 22, 2003. Tapes of these interviews were played to the jury. According to Detective Charmley, T.C. was about 5 feet 10 inches to 5 feet 11 inches

1    tall, and [Petitioner] was about 5 feet 4 inches to 5 feet 5 inches tall.

2         Detective Charmley denied that either he or Detective McBride used any force or
made any threats against [Petitioner] in connection with his interview. [Petitioner]'s booking
3    photograph showed [Petitioner] had a red mark on the right side of his face, an injury which
was apparently sustained during [Petitioner]'s arrest.
4
         The parties stipulated that at the time of the incident, [Petitioner] was residing on
5    Pinion Springs Circle in Bakersfield. They further stipulated that DNA recovered from
scrapings taken from the victim's fingernails belonged only to the victim.
6
     **The defense**
7
         The victim's sister-in-law, Ruth Flores, testified that she had seen [Petitioner] before
8    around the apartment complex where the victim lived. On that occasion, [Petitioner] waved
to the victim. The victim waved back and smiled at [Petitioner]. When Flores asked the
9    victim who he was, the victim said it was somebody who lived in the apartments.

10        Gary Sampley testified that he was an attorney practicing in Bakersfield, and that he
represented Stephen Anthony in June 2003, in two misdemeanor cases. While he was
11   working on those cases, he and the district attorney (a different prosecutor than the one in
[Petitioner]'s trial) negotiated a plea bargain based on Anthony providing information in a
12   recent murder case. Sampley could recall that one of the misdemeanors was dismissed, and
the other was either dismissed or "it was a credit-time-served/no probation type of result."
13   Sampley testified that the favorable dispositions were a direct result of Anthony's cooperation
in the murder case.
14
         [Petitioner] testified on his own behalf. According to [Petitioner]'s testimony, he once
15   lived in the victim's apartment complex for about a week but had not become acquainted with
the victim at that time. On an afternoon in June 2003, he and T.C. went to the apartment
16   complex. On this particular day, [Petitioner] was trying to find a telephone so he could call
his sister to come get him, and give him a ride to her apartment on Pinion Springs. He was
17   also looking for some water to drink because it was very hot.

18        While he and T.C. were sitting underneath some shade trees at the apartment
complex, the victim came out and started talking to them. The victim eventually invited them
19   into her apartment. She allowed [Petitioner] to use her telephone, and gave them some water
and something to eat.
20
         After they ate, the victim told [Petitioner] and T.C. they could watch a videotape.
21   They looked through her videotapes and selected one entitled "Next Friday." They watched
part of the movie, while [Petitioner] waited to use the telephone to call his sister again.
22   Eventually, [Petitioner] thanked the victim and told her he needed to leave. While he was in
the apartment, no one attacked the victim and she was fine when he and T.C. left.
23
         [Petitioner] acknowledged that he handled two videotapes in the victim's apartment:
24   "The Wizard of Oz" and "Next Friday." [Petitioner] testified that the victim handed him a
bag and he put the videotapes in the bag for her. The victim then grabbed the bag from him
25   and sat on the couch.

26        [Petitioner] testified that police officers used force against him when he was arrested
on June 22, 2003. [Petitioner] described one officer holding a gun to his head, and another
27   slamming him headfirst into a closet. Then other officers were jumping on him and stomping
on his hands. [Petitioner] claimed to have suffered multiple injuries. He explained that one
28   side of his face was slammed on the floor, and that he had splits in his lip from his teeth

hitting the inside of his mouth. He also had bruises all over his chest, arms, shoulder, stomach, ribs, and back.

Later, when [Petitioner] spoke to the detectives, he began by telling them the truth, i.e., that the victim was fine when he and T .C. left the apartment. However, because the detectives threatened him, he started to tell them the victim had been attacked even though this was not the truth. [Petitioner] explained that the detectives "basically told me what they wanted to hear."

[Petitioner] acknowledged that during the interview with detectives and as reflected on the tape played to the jury, he provided a number of descriptions of what he claimed T.C. did to the victim. [Petitioner] also acknowledged talking about a stereo which he had claimed was carried out of the apartment by T.C. [Petitioner] testified that that he actually did not know anything about a stereo; when he described T.C. carrying it, the detectives had already told him a stereo had been taken.

[Petitioner] denied either selling a stereo or renting a car to Stephen Anthony. He also denied that he handled any knives belonging to the victim while he was in her apartment. [Petitioner] admitted he had his own knife with him when he was inside the apartment, and that he also had it on him when he was arrested. However, he denied using the knife inside the victim's apartment.

On cross-examination, [Petitioner] acknowledged that during the interview with the police detectives, he described a number of specific details surrounding the attack on the victim which he attributed to T.C. Although [Petitioner] claimed to have been told some details by the detectives, a majority of the details he claimed to have guessed based on his "own instincts," watching "gang murder flicks," and from his personal experiences, which included having once being stabbed 23 times, stealing from his mother's purse as a child, and in 2001, pleading guilty to a felony conviction based on an incident where he was with a friend who tried to steal a woman's purse. The details [Petitioner] claimed to have guessed included: that the victim was choked, that she could not speak during the attack, that T.C. grabbed the knife he used to stab the victim from the kitchen, that the victim was stabbed multiple times in the front part of her body, that the victim's body was all curled up on the floor by one of the couches, that the victim's purse had been rifled through, and that the stereo the detectives told him was missing had been sold for crack cocaine.

[Petitioner] also testified during cross-examination that he carried a knife at all times. When asked why, he explained that he liked to cut himself on his arms when he got irritated or depressed.

[Petitioner] had a prior felony conviction for spousal abuse.

### *Rebuttal*

Officer Martin Heredia participated in the arrest of [Petitioner] on June 22, 2003. Several other officers were also present. Officer Heredia testified that he and Officer Slayton went into [Petitioner]'s bedroom. Officer Heredia asked [Petitioner] to get out of the bed. When [Petitioner] did not respond, the two officers approached the bed. Officer Heredia was on [Petitioner]'s left, and Officer Slayton was on his right. [Petitioner] had a blanket covering about three-quarters of his body. As Officer Heredia grabbed [Petitioner]'s left hand, [Petitioner] woke up, moved around, and somehow moved the blanket so that Officer Slayton was able to see a knife on [Petitioner]'s chest.

Officer Slayton advised Officer Heredia there was a knife present. The officers immediately grabbed [Petitioner]'s hands, and pulled him off the bed and onto the ground

face first. Detectives Charmley and McBride were notified that [Petitioner] was in custody, and [Petitioner] was transported to the police department. Other than having to take [Petitioner] off the bed to the ground, neither Officer Heredia nor Officer Slayton used any force on [Petitioner].

Detective Charmley testified that the entire conversation he had with [Petitioner] was on the recording played to the jury, except for a few portions that were redacted based on evidentiary rulings. Detective Charmley denied that the detectives made any threats to [Petitioner], or told him any information other than what was reflected in the recording.

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

### II. Legal Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the

adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,

1  94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

2  Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

3  decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th

4  Cir.1999).

5      AEDPA requires that we give considerable deference to state court decisions. The state

6  court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's

7  interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), cert. denied, 537

8  U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

9  **III.  Review of Petition**

10     **A.  Ground One**

11     In his first ground for relief, Petitioner claims his Sixth and Fourteenth Amendment rights

12  were violated when the prosecution excluded a prospective African-American juror.

13     1.  Factual Background

14     In response to preliminary questions from the trial court, Juror No. 516470 stated that
   she was "an instructional assistant for special need mobility" with no prior juror experience,
15  and that she had two adult sons.

16     Juror No. 516470 answered negatively when defense counsel asked if she might have
   a problem viewing gory photographs.
17
   In response to questions from the prosecutor, Juror No. 516470 explained she worked
18  with autistic children. When asked how long she had been doing this work, Juror No. 516470
   responded: "I just went back to work this year. I have been out of work for nine months."
19  When asked what she had been doing previously, Juror No. 516470 stated: "I was in the
   school system and then they had like the budget cut and then I was homeless." When asked
20  whether her earlier experience in the school system also involved working "with special
   needs", Juror No. 516470 replied: "No, it was working-I was still an instructional assistant
21  but it was like going around delivering packages to different classes."

22     In response to further questioning from the prosecutor, Juror No. 516470
   acknowledged some hesitation respecting the prosecutor's question, posed to the entire panel,
23  as to whether she would have a problem with a witness who had a criminal background. Juror
   No. 516470 disclosed that ten years ago, two of her nephews had been shot and that "they
24  never did find that person." When the prosecutor asked whether the fact nobody was ever
   arrested was going to cause a problem "for one side of [sic] the other," Juror No. 516470
25  answered: "I still think about it but, you know, your duty is your duty." Juror No. 516470
   then stated she would not hold it against anyone. In response to further questioning, the
26  prospective juror indicated she would not have any problem if there was not an eye witness to
   all the different facts in the case.
27
   Towards the end of voir dire, the prosecutor used a peremptory challenge to excuse
28  Juror No. 516470. Defense counsel made a motion "for mistrial under Wheeler." The trial

court asked defense counsel to explain the basis for the motion, and the following discussion took place:

"[DEFENSE COUNSEL]: Well, we had two African-Americans on the-in the box and People excused one of those two for reasons which I don't-I don't see a connection as far as prejudice, so it appears to me it was solely based on race.

"THE COURT: All right. Mr. Pafford [the prosecutor], it's not clear to me why Ms. (516470) was released after she had been accepted twice.

"[THE PROSECUTOR]: Your Honor, the strategy on accepting the panel two other times, I had noted that I was intending to kick additional people, it was a strategy because I knew Mr. Kinnison [defense counsel] was going to be kicking some individuals.

"I think that is-that does-in and of itself does not-should not prove any case of racial discrimination.

"As to Ms. (516470), I think she said she was homeless for a period of time, which caused me some concern for the case and her, given the nature of the case and the nature of the theories of the case, it caused me some concern that she was homeless recently, within the past year, so I think that was my basis.

"THE COURT: Mr. Kinnison [defense counsel].

"[DEFENSE COUNSEL]: Homeless can mean a lot of things, can mean she had to live with relatives; doesn't mean she was wandering the streets.

"I don't think there was any indication that she's unable to perform her duties.

"THE COURT: Well, your basis is race.

"[DEFENSE COUNSEL]: Yes, your Honor.

"THE COURT: Okay.

"[DEFENSE COUNSEL]: People of all races have become homeless. I maintain the position that that was the motivating factor. [¶] ... [¶]

"THE COURT: All right. The status, if you will, or even class, if it can be characterized as a class, of homelessness, is race neutral. I am denying the motion."

(LD 1.)

        2.  Review of Claim by State Courts

        The claim was first presented on direct appeal to the Fifth DCA.  On May 14, 2007, the Fifth DCA denied the claim in a reasoned opinion. (LD 1.) Petitioner then pursued his claim in a petition for writ of habeas corpus in the California Supreme Court. (LD 2.) The petition was denied on July 25, 2007. (LD 3.) The California Supreme Court is presumed to have denied the claims presented for the same reasons stated in the opinion of the Fifth DCA.  Ylst v. Nunnemaker, 501

1   U.S. 797, 803 (1991).

2          The appellate court analyzed and rejected the claim as follows:

3          [Petitioner] recognizes the prosecutor articulated a race-neutral reason for excusing
    Juror No. 516470, and that the reason is supported by the record. Nonetheless, he asserts
4   further inquiry by the trial court was required because the prosecutor's explanation was
    inherently implausible. (*People v. Silva, supra,* 25 Cal.4th at pp. 385-386 [where the
5   prosecutor's stated reasons are not supported by record or inherently implausible, the trial
    court is required to examine each stated reason as applied to challenged jurors; if that is not
6   done, a global finding that the prosecutor's reasons are sufficient is not enough to rebut the
    earlier finding of purposeful discrimination].) [Petitioner] urges us to conclude that the
7   circumstance of Juror No. 516470 being homeless favored the prosecution rather than the
    defense, thereby suggesting the reason articulated by the prosecutor for excusing the juror
8   was a sham.

9          In support of his contention that the prosecutor's reason was inherently implausible,
    [Petitioner] claims that, at the time Juror No. 516470 was excused, "the only theory of the
10  case to which homelessness related was a defense theory-the theory that a man who appeared
    to be homeless could have been the killer." In support of this claim, [Petitioner] cites to a
11  brief pretrial discussion regarding a witness the defense was trying to locate.[FN4]  Defense
    counsel told the trial judge that the witness, a resident in the victim's apartment complex,
12  could testify that she saw "... a tall, thin, black male subject who was essentially loitering
    around the apartment where the body was found ...." and that "at one point" she observed him
13  "... go into the apartment through the back window and come out again...."

14         FN4. [Petitioner] also relies on evidence presented in support of his new trial motion,
           which included testimony from the missing witness, who described a "black guy
15         roaming around in the alley" and apparently drinking an alcoholic beverage from a
           container inside a sack. However, because this evidence was not presented until after
16         the trial, it is irrelevant to the analysis of whether the prosecutor's use of the
           peremptory challenge was improper.

17
18         The pretrial discussion [Petitioner] cites does not support his claim that the defense
    theory at the time of jury-selection was related to homelessness. There is no indication that
19  the third party allegedly seen loitering around the victim's apartment and entering and exiting
    the apartment was characterized by defense counsel as a homeless person. That person was
20  simply described as "loitering"-a description which could arguably be applied to [Petitioner]'s
    description of what he and T.C. were doing before they were allegedly invited into the
21  victim's apartment-and does not support a conclusion that the prosecutor would necessarily
    have been thinking a juror sympathetic to the circumstance of homelessness would favor the
22  prosecution over the defense.

23         In our view, [Petitioner]'s argument is overly narrow and takes the prosecutor's
    justification out of its proper context. The juror's experience of being homeless was
24  mentioned in connection with her loss of employment, and the two conditions tend to go
    hand-in-hand. Homelessness, like unemployment, can be temporary or chronic; it is not a
25  condition distinguishing any particular race, religion, or ethnic group. Everyone is subject to
    its effects. Moreover, it had repeatedly been held that employment, or the lack of it, can be a
26  proper race-neutral criteria for exercising a peremptory challenge. (*People v. Trevino* (1997)
    55 Cal.App.4th 396, 411-412 [occupation can be a permissible, nondiscriminatory reason for
27  exercising a challenge]; *People v. Dominick* (1986) 182 Cal.App.3d 1174, 1195, fn. 13 [it is
    permissible to have exercised a peremptory challenge against a prospective juror who is an
    unemployed divorcee with three children who quit her last job after only three months];
28  *Stubbs v. Gomez* (9th Cir.1999) 189 F.3d 1099, 1107 [a juror's employment status or income

1    level is a permissible reason for exercising a peremptory challenge]; *Howard v. Moore* (4th Cir.1997) 131 F.3d 399, 408 [erratic work history, spouse's unemployment, and unstable

2    work history are not pretextual]; *U.S. v. Hunter* (7th Cir.1996) 86 F.3d 679, 683 [prospective juror had limited education, unstable employment history, he was unmarried and his family

3    did not have strong ties to the community]; *U.S. v. Brown* (1994) 34 F.3d 569, 571 [challenge striking a juror because she and everyone in her household are unemployed will survive

4    scrutiny, especially when, as here, the [Petitioner] is also unemployed; the prosecutor of such an unemployed [Petitioner] may have concerns that an unemployed juror might be

5    improperly sympathetic].)

6         In this case, the juror's homelessness, like the circumstance of unemployment, was a plausible race-neutral justification for excusing the juror and was supported by the record.

7    There is no indication that the trial court here failed to make a sincere and reasoned effort to evaluate the nondiscriminatory justification offered, and we therefore defer to the trial court's

8    ability to distinguish bona fide reasons from sham excuses. (*People v. Avila* (2006) 38 Cal.4th 491, 541.) Because there is substantial evidence to support the trial court's implied

9    finding the prosecutor's race-neutral explanation was genuine and not a pretext for racial or improper group discrimination, we conclude the trial court properly denied [Petitioner]'s

10   challenge to the prosecutor's use of a peremptory challenge against Juror No. 516470.

11   (LD 1.)

12        3.  Review of Claim

13        Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal

14   and state trials is governed by the standard established by the United States Supreme Court in <u>Batson</u>

15   <u>v. Kentucky</u>, 476 U.S. 79, 89 (1986).

16        In <u>Batson</u>, the United States Supreme Court set out a three-step process in the trial court to

17   determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause.

18   <u>Purkett v. Elem</u>, 514 U.S. 765, 767 (1995).  First, the defendant must make a prima facie showing

19   that the prosecutor has exercised a peremptory challenge on the basis of race. <u>Id</u>. That is, the

20   defendant must demonstrate that the facts and circumstances of the case "raise an inference" that the

21   prosecution has excluded venire members from the petit jury on account of their race. <u>Id</u>.

22        If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-

23   neutral explanation for its challenge. <u>Id.</u> At this step, "the issue is the facial validity of the

24   prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation,

25   the reason offered will be deemed race neutral." <u>Id.</u>, *quoting* <u>Hernandez v. New York</u>, 500 U.S. 352,

26   360  (1991).  Finally, the trial court must determine if the defendant has proven purposeful

27   discrimination. And "[s]ince the trial judge's findings in the context under consideration here largely

28   turn on evaluation of credibility, a reviewing court ordinarily should give those findings great

1   deference." <u>Batson</u>, 476 U.S. at 98, n.21.

2       In this case, Petitioner made a prima facie showing that the prosecutor excused a juror on the

3   basis of race. The trial court stated that an inference was raised and asked the prosecutor to provide

4   the reason for the dismissal. The burden then shifted to the prosecutor to provide a race-neutral

5   reason. The prosecutor stated that Juror No. 516470 admitted she was homeless for a period of time,

6   and this caused him concern given the nature of the case and theories of the case. The explanation

7   was deemed race-neutral by the trial court and accepted. Petitioner complains that the explanation

8   was race-neutral but it was a sham since the circumstance of the juror being homeless actually

9   helped the prosecution. As discussed by the appellate court, however, Petitioner's argument was

10  extremely speculative and was not before the trial court. Homelessness and loss of employment are

11  plausible race-neutral justifications for excusing a juror, and there was substantial evidence in the

12  record to support it in this case.

13      Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a

14  decision that was contrary to, or involved an unreasonable application of, clearly established Federal

15  law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). The claim

16  should be denied.

17      **B. Ground Two**

18      Petitioner next claims the trial court improperly refused to admit witness testimony regarding

19  third-party culpability.

20      1. Factual Background

21          During cross-examination, defense counsel started to ask Lisa Espinoza: "Now, your
    mother, she had been talking about a man who had been bothering her for a while...." The
22  prosecution interjected an objection on relevance and hearsay grounds. After discussing the
    issue outside the presence of the jury, the trial court sustained the prosecutor's objection on
23  both grounds.

24          On appeal, defendant contend[ed] the trial court erred in excluding evidence that
    "someone other than defendant had been bothering the victim shortly before she was killed",
25  even though it was hearsay, because the ruling prevented him from presenting evidence of
    third-party culpability, thereby depriving him of his right to due process, the right to a fair
26  trial, and the right to present a defense.

27  (LD 1.)

28

1        2.  Review by State Courts

2        As with the first claim, this claim was initially presented on direct appeal to the Fifth DCA

3    where it was denied in a reasoned opinion. (LD 1.) Petitioner then presented the claim in a petition

4    for review in the California Supreme Court, and the petition was summarily denied. (LD 2,3.) The

5    California Supreme Court is presumed to have denied the claims presented for the same reasons

6    stated in the opinion of the Fifth DCA.  Ylst, 501 U.S. at 803.

7        In denying the claim, the Fifth DCA stated:

8            In this case, the evidence the defense sought to elicit from Espinoza did not meet the
     relevancy threshold established in [*People* v.] *Hall* [, 41 Cal.3d 826, 833 (1986)]. Defense
9    counsel made no offer of proof linking the third person "to the actual perpetration of the
     crime." *Hall, supra,* 41 Cal.3d at p. 833.) Defense counsel argued that Ruth Flores's
10   evidence (presumably, her testimony that the victim waved and smiled at defendant) would
     show that defendant was *not* the man who had been bothering her and, therefore, evidence
11   that someone else besides defendant was bothering the victim before she was killed "...
     would tend to exonerate [his] client as being the person who perpetrated this incident."
12   However, even assuming defendant was not the person the victim said was bothering her, the
     defense offered no evidence that the person bothering the victim was the one who committed
13   the murder. Rather, counsel simply speculated that the person bothering the victim "could
     have been" the same person seen "lurking around the apartments" by the witness he was
14   unable to locate. Nor did the defense offer to show how or in what manner the third party had
     been bothering the victim. Although defendant implies throughout his argument on appeal
15   that the "bothering" was of a menacing nature, no evidence supporting this interpretation was
     offered. Bothering may encompass a wide range of behaviors, including behaviors that may
16   be annoying but otherwise relatively benign or harmless. No link was shown here between
     the bothersome behavior of the third party and the brutal physical attack on the victim.
17   Because the defense offered no evidence capable of raising a reasonable doubt as to
     defendant's guilt, we reject defendant's contention that the trial court erroneously excluded
18   evidence of third party culpability.

19           Defendant's federal constitutional argument likewise fails to persuade us. The right to
     present relevant testimony "is not without limitation" and " 'may, in appropriate cases, bow
20   to accommodate other legitimate interests in the criminal trial process .' " (*Rock v. Arkansas*
     (1987) 483 U.S. 44, 55, quoting *Chambers v. Mississippi* (1973) 410 U.S. 284, 295.) " 'Few
21   rights are more fundamental than that of an accused to present witnesses in his [or her] own
     defense,' " but " 'the accused, as is required of the State, must comply with established rules
22   of procedure and evidence designed to assure both fairness and reliability in the
     ascertainment of guilt and innocence.' " (*LaGrand v. Stewart* (9th Cir.1998) 133 F.3d 1253,
23   1266-1267, quoting *Chambers v. Mississippi, supra,* 410 U.S. at p. 302.) "[W]e have never
     questioned the power of States to exclude evidence through the application of evidentiary
24   rules that themselves serve the interests of fairness and reliability-even if the defendant
     would prefer to see that evidence admitted." (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.)
25   Since the trial court's ruling sustaining the prosecutor's objection on hearsay grounds was
     well within the scope of that power, and defendant did not meet the relevancy threshold for
26   the admission of third-party-culpability evidence set forth in *Hall,* defendant's federal
     constitutional argument is without merit.

27   (LD 1.)

28

1          3.  Review of Claim

2          "[T]he Constitution guarantees criminal defendants a 'meaningful opportunity to present a

3   complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986), quoting California v. Trombetta,

4   467 U.S. 479, 485 (1984). "The right of an accused in a criminal trial to due process is, in essence,

5   the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi,

6   410 U.S. 284, 294 (1973). "'A person's right to reasonable notice of a charge against him, and an

7   opportunity to be heard in his defense-a right to his day in court-are basic in our system of

8   jurisprudence....'" Id., quoting In re Oliver, 333 U.S. 257, 273 (1948).

9          Nevertheless, the admissibility of evidence is generally a matter of state law and not

10  reviewable in a federal habeas corpus proceeding. Estelle v. McGuire, 502 U.S. 62, 68 (1991);

11  Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), cert. denied, 478 U.S. 1021 (1985). But "[t]he

12  Supreme Court has made clear that the erroneous exclusion of critical, corroborative defense

13  evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth

14  Amendment right to present a defense." DePetris v. Kuykendall, 239 F.3d 1057, 1062 (9th

15  Cir.2001), citing Chambers, 410 U.S. at 294. When a hearsay statement bears persuasive assurances

16  of trustworthiness and is critical to the defense, the exclusion of that statement may rise to the level

17  of a due process violation. Chambers, 410 U.S. at 302.

18         In federal habeas proceedings, the Ninth Circuit has "traditionally applied a balancing test to

19  determine whether the exclusion of evidence in the trial court violated petitioner's due process rights,

20  weighing the importance of the evidence against the state's interest in exclusion." Chia v. Cambra,

21  360 F.3d 997, 1003 (9th Cir.2004), citing Miller v. Stagner, 757 F.2d 988, 994 (9th Cir.), amended on

22  other grounds, 768 F.2d 1090 (9th Cir.1985). "In balancing these interests, we must, on the one

23  hand, afford 'due weight to the substantial state interest in preserving orderly trials, in judicial

24  efficiency, and in excluding unreliable ... evidence.'" Chia, 360 F.3d at 1003-04, quoting Miller, 757

25  F.2d at 995. "'On the other hand, we must stand vigilant guard over the principle that '[t]he right to

26  present a defense is fundamental' in our system of constitutional jurisprudence.'" Chia, 360 F.3d at

27  1004, quoting Perry v. Rushen, 713 F.2d 1447, 1450-51 (9th Cir.1983) (noting that "[b]ecause this

28  right is so important, language from some cases and commentary suggests that the defendant's right

1   carries conclusive weight, and that the exclusion of *any* relevant evidence is unconstitutional"

2   (emphasis in original)). In light of these competing interests, a federal habeas court must "'determine

3   what weight the various interests will carry when placed on the scales,'" id. at 1450, and "ultimately

4   determine whether the decision of the state court to exclude the evidence in question was reasonable

5   or unreasonable." Chia, 360 F.3d at 1004.

6          In assessing the interests at issue in this case, this Court must invoke the five-part balancing

7   test formulated in Miller. These factors include: (1) the probative value of the excluded evidence on

8   the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4)

9   whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a

10  major part of the attempted defense. Miller, 757 F.2d at 994.

11         The evidence at issue in this case does not meet a single factor set forth above. Defense

12  counsel made no offer of proof linking the third party to the actual perpetration of the crime. In

13  addition, Petitioner claims this third party had been "bothering" the victim; however, there was no

14  evidence that a third party had been doing anything other than lurking. Certainly there was no

15  evidence that a third party had been menacing or threatening the victim. Defense counsel was merely

16  speculating that this unidentified third party was somehow involved. The evidence was completely

17  irrelevant. Therefore, it is clear the state court decision rejecting Petitioner's claim was not contrary

18  to, nor did it involve an unreasonable application of, clearly established Federal law as set forth by

19  the Supreme Court. The claim should be denied.

20  **C.  Ground Three**

21         In his final claim for relief, Petitioner alleges the trial court erred by instructing the jury with

22  CALJIC No. 2.15[3] as to the robbery special circumstance allegation. He claims the instruction

---

23

24  [3]The trial court instructed the jury with CALJIC No. 2.15 as follows:

25         If you find the defendant was in conscious possession of recently stolen property, the fact that
    possession is not by itself sufficient to permit an inference that the defendant committed robbery and/or burglary.

26  Before that may be inferred, there must be corroborating evidence tending to prove - - tending to prove the
    defendant committed robbery and/or burglary.

27         However, this corroborating evidence needs only be slight and need not by itself be sufficient to warrant

28  an inference of that conclusion.

1    reduced the quantum of evidence required for conviction to less than reasonable doubt.

2        1.  Review by State Courts

3        As with the first claim, this claim was initially presented on direct appeal to the Fifth DCA

4    where it was denied in a reasoned opinion. (LD 1.) The claim was then presented in a petition for

5    review in the California Supreme Court where it was summarily denied. (LD 2,3.) The California

6    Supreme Court is presumed to have denied the claims presented for the same reasons stated in the

7    opinion of the Fifth DCA.  Ylst, 501 U.S. at 803.

8        In denying the claim, the Fifth DCA stated:

9            CALJIC No. 2.15 generally "is a permissive, cautionary instruction which inures to a
         criminal defendant's benefit by warning the jury not to infer guilt merely from a defendant's
10        conscious possession of recently stolen goods, without at least some corroborating evidence
         tending to show the defendant's guilt. [Citations.]"  *People v. Barker* (2001) 91 Cal.App.4th
11        1166, 1174.) CALJIC No. 2.15 has previously withstood due process constitutional attacks in
         cases where theft-related offenses were the predicate felonies for a felony-murder charge. (
12        *People v. Johnson* (1993) 6 Cal.4th 1, 37-38; *People v. Smithey* (1999) 20 Cal.4th 936, 975-
         978; *People v. Holt* (1997) 15 Cal.4th 619, 677.) Our Supreme Court has consistently held
13        that CALJIC No. 2.15 does not create an improper presumption of guilt arising from the mere
         fact of possession of stolen property. Rather, "it relates a contrary proposition: a burglary [or
14        robbery] may not be presumed from mere possession unless the commission of the offense is
         corroborated."  *People v. Johnson, supra,* 6 Cal.4th at p. 37.) Furthermore, CALJIC No. 2.15
15        does not permit an inference of guilt based on insufficient foundational facts or reduce the
         quantum of evidence to anything less than reasonable doubt. (*People v. Holt, supra,* 15
16        Cal.4th at p. 677.) It is equally well established that requiring only "slight" corroborative
         evidence in support of a permissive inference, such as that created by possession of stolen
17        property, does not reduce the prosecutor's burden of proving every element of the offense or
         otherwise violate the accuser's right to due process. ( *Ulster County Court v. Allen* (1979) 442
18        U.S. 140, 167; *People v. McFarland* (1962) 58 Cal.2d 748, 754-756; *People v. Gamble*
         (1994) 22 Cal.App.4th 446, 454-455.)

19
         Defendant's reliance upon *United States v. Gray* (5th Cir.1980) 626 F.2d 494 (*Gray*)
20        is misplaced. There, a trial court instructed that only "slight" evidence was necessary to
         establish a defendant's participation in a conspiracy. In *Gray,* the Fifth Circuit Court of
21        Appeals reiterated an earlier holding that such an instruction was erroneous because it tainted
         the reasonable doubt standard that applied to each element of an offense. (*Id.* at p. 500; see
22        *United States v. Brasseaux* (5th Cir.1975) 509 F.2d 157.) The instruction directly addressed
         the defendant's participation in the conspiracy and, because actual participation in the
23        conspiracy is an essential element of a conspiracy charge (e.g., *United States v. Avila-
         Dominguez* (5th Cir.1980) 610 F.2d 1266, 1271), created confusion over the prosecution's

24    _____

25            As corroboration, you may consider the attributes of possession, time, place and manner, that the defendant
         had an opportunity to commit the crime charged, the defendant's conduct, his false or contradictory statements, if
26        any, or other statements he may have made with reference to the property, a false account of how he acquired
         possession of the stolen property and any other evidence which tends to connect the defendant with the crime
27        charged.

28    (LD 1.)

1    burden to prove each element beyond a reasonable doubt.

2         Here, the jury was cautioned about inferring the commission of a robbery based on
     defendant's possession of the stolen property and the need for other corroborating
3    circumstantial evidence. Therefore, unlike the instruction in *Gray*, CALJIC No. 2.15 did not
     address a particular element of the offense charged and undermine the requirement that the
4    element must be proven beyond a reasonable doubt-a topic addressed in other instructions.

5         In summary, we adhere to the position established by the California Supreme Court
     and reject defendant's argument that CALJIC No. 2.15 is unconstitutional.
6
     (LD 1.)
7
          2.  Review by Claim
8
          The Supreme Court has held that the fact that an instruction was allegedly incorrect under
9
     state law is not a basis for habeas relief. Estelle v. McGuire, 502 U.S. 62, 71 (1991), *citing* Marshall
10
     v. Lonberger, 459 U.S. 422, 438, n. 6 (1983) ("[T]he Due Process Clause does not permit the federal
11
     courts to engage in a finely tuned review of the wisdom of state evidentiary rules"). Federal habeas
12
     courts therefore do not grant relief simply because an instruction may have been deficient. Estelle,
13
     502 U.S. at 72.  The only question is "whether the ailing instruction by itself so infected the entire
14
     trial that the resulting conviction violates due process." Cupp v. Naughten, 414 U.S. 141, 147
15
     (1973); see also Estelle, 502 U.S. at 72; Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Donnelly v.
16
     DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is
17
     undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional
18
     right]'"). "It is well established that the instruction 'may not be judged in artificial isolation,' but
19
     must be considered in the context of the instructions as a whole and the trial record." Estelle, 502
20
     U.S. at 72, *quoting* Cupp v. Naughten, supra, 414 U.S., at 147. In addition, in reviewing the
21
     instruction, the court must inquire "whether there is a reasonable likelihood that the jury has applied
22
     the challenged instruction in a way" that violates the Constitution. Boyde v. California, 494 U.S.
23
     370, 380 (1990). The reviewing court must also bear in mind the Supreme Court's previous
24
     admonition that "we 'have defined the category of infractions that violate 'fundamental fairness' very
25
     narrowly.'" Estelle, 502 U.S. at 72, *quoting* Dowling v. United States, 493 U.S. 342, 352 (1990).
26
          As discussed by the appellate court, CALJIC No. 2.15 is a permissive inference instruction
27
     which allows the jury to infer a defendant committed burglary or robbery if the defendant was in
28

1   conscious possession of recently stolen property, but only if there is corroborating evidence tending

2   to prove the defendant committed the robbery or burglary. The instruction does not lessen the state's

3   burden of proving every element. In fact, it instructs the jury that mere possession of stolen property

4   is insufficient to find a defendant committed burglary or robbery.  Furthermore, "an inference of

5   guilty knowledge drawn from the fact of unexplained possession of stolen goods" is a "traditional

6   common-law inference deeply rooted in our law." Barnes v. United States, 412 U.S. 837, 843 (1973).

7       Petitioner has failed to demonstrate that the state court rejection of his claim "resulted in a

8   decision that was contrary to, or involved an unreasonable application of, clearly established Federal

9   law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). This claim

10  should also be denied.

11                                **RECOMMENDATION**

12      Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

13  DENIED. It is FURTHER RECOMMENDED that the Clerk of Court be DIRECTED to enter

14  judgment for Respondent.

15      This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill,

16  United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule

17  72-304 of the Local Rules of Practice for the United States District Court, Eastern District of

18  California.  Within thirty (30) days (plus three days if served by mail) after being served with a copy,

19  any party may file written objections with the court and serve a copy on all parties.  Such a document

20  should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to

21  the objections shall be served and filed within ten (10) court days (plus three days if served by mail)

22  after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to

23  28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified

24  time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th

25  Cir. 1991).

26  IT IS SO ORDERED.

27  **Dated:    February 27, 2009                            /s/ Sandra M. Snyder**
                                              UNITED STATES MAGISTRATE JUDGE

28